UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHARLES E. MALE,

                              Plaintiff,

        -vs-

                                                    DECISION AND ORDER

TOPS MARKETS, LLC,

                                                    09-CV-6352 CJS

                              Defendant.


_____

APPEARANCES

For Plaintiff:              Steven E. Laprade, Esq.
                            Christina A. Agola, Esq.
                            730 First Federal Plaza
                            28 East Main Street
                            Rochester, New York 14614

For Defendant:              Mark A. Moldenhauer, Esq.
                            Bond, Schoeneck & King, PLLC
                            40 Fountain Plaza
                            Key Center, Suite 600
                            Buffalo, New York 14202-2200


INTRODUCTION

        This is an action alleging retaliation, pursuant to Title VII of the Civil Rights Act of

1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the New York Human

Rights Law ("NYHRL"), Executive Law § 290 *et seq.*  Now before the Court is

Defendant's  motion [#10] for summary judgment.  The application is granted.

1

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most-favorable to Plaintiff.  Charles Male ("Plaintiff") was employed by Tops Markets ("Defendant") from 1992 until October 14, 2008, when Defendant terminated his employment.  At all relevant times, Plaintiff held the position of "Nonperishable Manager" at Store 410.  As the title implies, Plaintiff was in charge of non-perishable grocery items at his assigned store location, and he also had supervisory authority over grocery clerks. Plaintiff was essentially the third-in-command at Store 410, below the Store Manager, Trish O'Connell ("O'Connell"), and the Assistant Manager, Doug Linborg ("Linborg"). Before the termination of his employment, Plaintiff had no disciplinary complaints against him.

Prior to July 2007, Plaintiff's wife, Julie Male ("Mrs. Male"), was also employed by Defendant, at a different store.  In January 2006, Mrs. Male left work on disability, and has never returned.  In June 2006, Mrs. Male filed an EEOC complaint against Defendant, alleging that Defendant discriminated against her, in violation of the Americans with Disabilities Act ("ADA"), by refusing to accommodate her physical limitations.  Notably, Mrs. Male did not allege that the supposed discrimination had anything to do with her race, color, religion, sex, or national origin.  On July 23, 2007, Defendant terminated Mrs. Male's employment.  In November 2007, Mrs. Male commenced a discrimination lawsuit against Defendant in this Court, alleging

discrimination and retaliation under the ADA[1], which was assigned to the Honorable

Michael A. Telesca, Senior United States District Judge.  On April 22, 2008, Judge

Telesca dismissed that action for failure to state a claim.  On April 14, 2008, Mrs. Male

filed a second EEOC complaint, alleging that Defendant was retaliating against her by

providing negative information about her to prospective employers.  Apparently, Mrs.

Male made such allegation based not on any affirmative information that Defendant was

so acting, but because she simply had not been hired by anyone.  *See*, Pl. Exhibits, Vol.

II, Ex. B.  Curiously, this second EEOC complaint alleged retaliation under *Title VII*, even

though, as noted earlier, her protected activity involved complaining about alleged

disability discrimination, not discrimination based on race, color, religion, sex, or national

origin.  On May 29, 2008, Mrs. Male commenced a second discrimination lawsuit in this

Court, which was also assigned to Judge Telesca, and which is still pending.[2]  The

Complaint in that action alleges that Mrs. Male suffered from certain mental and physical

disabilities, for which Defendant failed to provide reasonable accommodation, and for

which Defendant deemed her unable to perform the essential functions of her job.  *See,*

*Male v. Tops Markets, LLC*, 08-CV-6234 MAT, Docket No. [#1].  The Complaint also

asserts retaliation under *Title VII*.[3]  In the instant lawsuit, Plaintiff maintains that

---

[1]Plaintiff later tried to amend her Complaint to add a claim under the Family Medical Leave Act ("FMLA"), but Judge Telesca denied that request.

[2]The second lawsuit purported to assert a claim under Title VII, even though it contained no factual allegations concerning discrimination based on race, color, religion, sex, or national origin.  The Complaint indicated that the alleged retaliation was in response to Mrs. Male's prior ADA lawsuit.  Judge Telesca dismissed the action based on res judicata.  The Second Circuit found that the purported Title VII claim was not barred by res judicata, since it allegedly arose after Plaintiff's first lawsuit was dismissed. However, neither Judge Telesca nor the Second Circuit has, as of yet, ruled on the merits of the purported Title VII claim.  *See, Male v. Tops Markets, LLC*, 08-CV-6234 MAT, docket nos. [#1],[#12] and [#17].

[3]The Complaint also asserts claims under the FMLA and a disability claim under the NYHRL.

3

Defendant terminated his employment in retaliation for the protected activity by his wife[4], as well as in retaliation for his reporting incidents of sexual harassment involving other employees, as discussed below.  Defendant, however, contends that its decision to terminate Plaintiff's employment was not retaliatory, and was based solely on Plaintiff's own inappropriate comments to a female subordinate.

The incident which resulted in the termination of Plaintiff's employment occurred in September  2008.  Prior to that, Plaintiff had been involved, in his supervisory capacity, in responding to alleged sexual harassment involving other employees on four occasions.[5]  The first incident, which occurred in or around 1998,[6] involved a male assistant manager who was flirtatious toward female co-workers.  Plaintiff spoke to the male employee about his conduct several times, and also reported the situation to his district manager, Mike Herner ("Herner").  The second incident, which occurred in or about 2006[7], involved a female associate who complained about a male co-worker, who was in the habit of discussing his sexual activities.  Plaintiff reported the matter to Defendant's Human Resources Director,  Denise Rachow ("Rachow"), and he subsequently spoke to the male co-worker and directed him not to discuss his sexual activities with his co-workers.  The third incident, which occurred in or about the Spring of

---

[4]Plaintiff contends that he was "a witness" to the alleged discrimination against his wife, though there is no indication that he was ever revealed to Defendant as such, and that he therefore also engaged in protected activity.

[5]Some of these incidents occurred before Plaintiff was assigned to Store 410.

[6]Pl. Dep. at 13, 115.

[7]Pl. Dep. at 115.

2008[8], involved a male employee who made an offensive remark about a female employee's body.  Another male employee heard the comment, and reported it to O'Connell.  Plaintiff subsequently took a written statement from the female employee about the incident, and gave it to O'Connell, after which he had no further involvement in the incident.

The fourth incident occurred in September 2008, and involved allegations of sexual harassment by a male employee against Samantha Jensen ("Jensen"), an Assistant Customer Service Representative at Store 410 over whom Plaintiff did not have direct supervisory authority.  Plaintiff states that he had a friendly relationship with Jensen, and that she often talked to him, and to others at the store, about her personal life.  Plaintiff indicates, for example, that Jensen told him that her husband had been convicted of a sexual offense and was listed on a sex-offender registry.  Subsequently, in or about September 2008, Jensen told Plaintiff that her husband was upset because a male co-worker, with whom she had previously had a relationship, kept asking her on dates, and that her husband was threatening to harm the co-worker if he did not stop. Plaintiff told Jensen to report the matter as sexual harassment to O'Connell, but Jensen replied that she would not do so, because the male co-worker was a nice man whom she did not want to get into trouble.  Plaintiff responded that he had an obligation to report the matter to O'Connell, and he later did so.  However, Plaintiff also told Jensen that in his opinion, it appeared that she was following the male co-worker around the store and finding opportunities to spend time with him, not vice versa. Pl. Dep. at 105-106.   After

---

[8]Pl. Dep. at 120.

Plaintiff related the information to O'Connell, she responded that she "would take care of it" by talking to Jensen.  Plaintiff does not know whether anything further happened concerning the situation.

A few weeks later, the incident occurred for which Plaintiff was purportedly terminated.  Specifically, on or about September 24, 2008, Plaintiff and Jensen had a conversation in the manager's office at Store 410.  Another employee, Laurie Parnusie ("Parnusie"), was also present during part of the conversation.  Plaintiff told Jensen that he was upset because a convicted pedophile lived near Plaintiff's home.  Plaintiff told Jensen that he was driving his children to school, because he did not want them to use a bus stop which was near the pedophile's residence.  As mentioned above, Plaintiff was already aware that Jensen's husband was a registered sex offender.  However, Plaintiff maintains that during this conversation, he did not make any disparaging comments about Jensen's husband.  In particular, Plaintiff denies that he called Jensen's husband a pedophile or a loser.  Plaintiff admits, though, that he asked Jensen whether she was concerned about her husband harming her daughter, because Jensen seemed "nervous [that] something was going wrong between her husband and daughter." Pl. Dep. at 124-125.  Plaintiff also denies that he called Jensen "crazy" or a "bad mother."  However, he acknowledges that, either during this same conversation or during another conversation in September 2008, Jensen told him that she left her daughter alone at home after school, and he responded that she should not do that, because it was illegal, and it could harm her chances of obtaining custody of another one of her children. *Id*. 178-179, 184-185.  Plaintiff did not think that there was anything inappropriate about his comments, because he had a friendly relationship with Jensen, and because Jensen openly

discussed her personal life.

On September 29, 2008, unbeknownst to Plaintiff, Jensen complained about him to Linborg.  Specifically, Jensen told Linborg that during the  September 24, 2008, conversation, Plaintiff made several disparaging comments about her husband. Rachow Aff. ¶ 13.  Linborg did not immediately notify O'Connell about the complaint, because O'Connell was on vacation.  Linborg also did not notify Plaintiff about Jensen's complaint.

On the following day, September 30, 2008, Plaintiff received a phone call at work from Jensen's husband, Earl Jensen ("Mr. Jensen").  According to Plaintiff, Mr. Jensen said that "he was sick and tired of his wife coming home and complaining about [Plaintiff] yelling at her, making fun of her and making fun of her family life." Pl. Dep. at 148.  Mr. Jensen further stated that Plaintiff should "stay away from [his] wife, don't look at her, don't talk to her," and that if Plaintiff did not, there would be "very serious repercussions." *Id*.  Immediately thereafter, Plaintiff called Linborg, his direct supervisor.  At deposition, Plaintiff indicted, without elaborating, that he told Linborg "the whole story" concerning the phone call, and that Linborg told him to "drop it" and "not worry about it." *Id*. at 152. Plaintiff also sent an email to O'Connell, indicating that he had something to tell her when she returned from vacation.

On or about October 3, 2008, O'Connell returned from vacation, and Plaintiff told her about the phone call from Mr. Jensen.  According to Plaintiff, O'Connell asked him if he remembered saying anything to Jensen or Mr. Jensen that might have provoked the phone call, and Plaintiff responded, "No." Pl. Dep. at 162.  Plaintiff indicates that O'Connell told him, "[Don't] worry about it.  Drop it." *Id*. at 170.

7

Also on October 3, 2008, and again unbeknownst to Plaintiff, Linborg notified Rachow about Jensen's complaint, and Rachow began an investigation. Rachow Aff. at ¶¶ 12-14.  Rachow telephoned Jensen, who indicated that Plaintiff made the following statements to her: 1) Plaintiff complained about a pedophile living near him, and brought up the fact that Jensen's husband had been convicted of a sexual crime involving a minor; 2) Plaintiff said Jensen was "fucking crazy" for marrying such a "loser," and that in her relationships with men she went from "one loser to another"; 3) Plaintiff said, referring to Mr. Jensen, "once a pedophile, always a pedophile," and asked Jensen if she wasn't worried that her husband would harm her daughter; and 4) Plaintiff said that Jensen was a bad mother for leaving her daughter home alone after school, and she should see a "shrink" because "there is obviously something wrong with her." Rachow Aff. ¶¶ 17-19. Jensen further indicated that she had told her husband about Plaintiff's comments, which prompted Mr. Jensen to call and threaten Plaintiff. Rachow then telephoned Parnusie, who stated that she was present during the conversation and heard Plaintiff make the complained-of statements to Jensen. *Id*. at ¶¶ 23-25.   Rachow subsequently took written statements from Jensen and Parnusie, confirming what they told her on the telephone. Rachow Aff. ¶ 34 and Exs. C & D.[9]

Rachow also spoke with O'Connell concerning Jensen's complaint.  According to Rachow, O'Connell indicated that she had asked Plaintiff what might have prompted Mr. Jensen's threatening call, and Plaintiff responded that he had a conversation with

---

[9]Plaintiff contends that the unsworn statements by Jensen and Parnusie are false, and that the Court should disregard them as hearsay.  However, they are admissible not for the truth asserted, but for the fact that they were made and the effect that they had on Rachow, who relied on them in making her decision to terminate Plaintiff's employment.

Jensen, in which he stated that she should not leave her daughter alone at home because it was illegal and someone might report her. Rachow Aff. [#15] at ¶ 29.

Rachow  also spoke to Linborg, who indicated that Plaintiff had called him immediately following the threatening phone call from Mr. Jensen.  According to Linborg, Plaintiff specifically told him that Mr. Jensen called in response to a particular conversation that Plaintiff had with Mrs. Jensen a week earlier. Rachow Aff., Ex. B Linborg Email ("He told me about a phone call he received from Samantha Jensen's . . . husband about a conversation Sam and Chuck had about a week ago.").  Linborg further described his conversation with Plaintiff to Rachow, in pertinent part,  as follows:

> I made it clear to Chuck that I was unaware of his conversation with Sam and that he would have to elaborate.  He said that he and Sam were talking about their kids and the topic of sex offenders came up.  Chuck stated that he drives his kids to school because a sex offender lives near his kids' bus stop.  He asked Sam "doesn't she worry about leaving her kids home alone with Earl because he's a pedophile?"  He also said that "she should go a shrink or something because there['s] something obviously wrong with her. She shouldn't leave her nine year old daughter home alone after school. She could get in trouble and lose her kids because it's against the law and that is why she doesn't have custody of her son."

*Id.*[10]

On October 9, 2008, Rachow and O'Connell met with Plaintiff, and asked him what he thought might have prompted Mr. Jensen's angry call.  Plaintiff offered that Jensen might have been upset with him, because on the night of the phone call, Plaintiff and Linborg had failed to deliver certain written reprimands that Jensen had requested be given to employees under her supervision. *Id*. at 176-177.  According to Plaintiff,

---

[10]Plaintiff contends that the information in Lindborg's email is false, but he does not dispute that Lindborg sent the information to Rachow.

"That was the only thing I could think of." *Id*. at 176, 180.  Rachow then asked Plaintiff

about his conversation with Jensen, in which he indicated that she should not leave her

daughter alone at home after school, and Plaintiff admitted that he had told Jensen that,

"if she was trying to get custody of her son, she doesn't really want something like that to

go against her." *Id*. at 179; *see also, id*. at 182-185.  In response to repeated questioning

by Rachow, Plaintiff indicated that he could not think of any other reason why Mr. Jensen

might have called him. *Id*. at 180.  Regarding her interview of Plaintiff, Rachow states: "In

sum, Mr. Male told me and Ms. O'Connell that he too was interested to know why Mr.

Jensen called him in such a threatening manner, but that he could not think of anything

specific he did to provoke such a call." Rachow Aff. at ¶ 36.[11]

Rachow indicates that she found Plaintiff's explanation "unbelievable," for several

reasons. Rachow Aff. ¶ 37.  For example, she stated that Jensen and Parnusie agreed

that Plaintiff had made the statements about which Jensen complained. *Id*.  Rachow also

considered that, according to Linborg, Plaintiff admitted that he made several of those

comments, and that such comments would likely explain why Mr. Jensen had been so

angry. *Id*. at ¶ ¶ 38-39.  On the other hand, Rachow did not believe that Plaintiff's version

of events would explain why Mr. Jensen was so angry.  Overall, Rachow decided that

Plaintiff was "disingenuous and not at all credible," and that he was trying to mislead

O'Connell and herself. *Id*. at ¶ 40.  Moreover, Rachow concluded that Plaintiff had made

the following statements to Jensen: 1) "once a pedophile, always a pedophile," in

---

[11]Overall, therefore, during his interview with Rachow and O'Connell, Plaintiff denied making most of the comments alleged by Jensen, but admitted that he told her she should not leave her daughter at home alone.  Plaintiff did not admit to Rachow and O'Connell that he had asked Jensen whether she was worried that her husband might molest her daughter, although at deposition he admitted asking Jensen that question.

reference to her husband; 2) her husband would probably be touching her daughter; 3)
she was a bad mother for leaving her daughter alone with her husband; 4) she knew her
husband was bound to perpetrate sex crimes involving a minor in the future; 4) Mr.
Jensen was a loser and all of Jensen's male companions had been losers; 5) Jensen
was "fucking crazy"; and 6) Jensen should see a psychiatrist because there was
obviously something wrong with her. Rachow Aff. [#15], Ex. E.  As a result, Rachow
decided to terminate Plaintiff's employment.  Rachow indicates that the alleged protected
activity by Mrs. Male and Mr. Male had nothing to do with her decision. Rachow Aff. at ¶
¶ 47-55.

        As discussed above, Plaintiff denies that he made many of the statements alleged
by Jensen.  However, he agrees that if a manager actually made such statements, it
would "absolutely" show "a lack of judgment and disregard for basic managerial
responsibilities in making those statements to an associate." Pl. Dep. at 194.  Plaintiff
further agrees that such statements, if made, are inappropriate and unacceptable, and
that an employee would be disciplined for making them. *Id*. at 195.  Moreover, although
Plaintiff maintains that Jensen's accusations are false, he admits that he has no
evidence that Jensen did not actually make such accusations. *Id*. at 196.  In fact, Plaintiff
speculates that Jensen may have told her husband that Plaintiff said such things, in
order to provoke a discussion with her husband about her concern for her daughter's
safety. Pl. Dep. at 128, 134.

        On or about October 17, 2008, Plaintiff filed an EEOC complaint, in which he
alleged that Defendant retaliated against him, for his "wife's engagement in protected
activity , and for [his] reporting sexual harassment to management." Pl. Exs. Vol. II, Ex.

D.[12]

On July 10, 2009, Plaintiff commenced this action, alleging retaliation under Title VII and the NYHRL.[13]  Plaintiff maintains that he was fired in retaliation for his wife's complaints of disability-related discrimination, and in retaliation for his own actions in bringing forward other employees' complaints of sexual harassment.  Plaintiff contends Jensen's accusations against him were "simply fabricated in an attempt to terminate [him]." Pl. Aff. at ¶ 84.

Following the completion of discovery, Defendant filed the subject motion for summary judgment.   Defendant maintains that Plaintiff cannot establish a prima facie case of retaliation, because he did not engage in protected activity, and because he has not shown a sufficient causal nexus between any such activity and the termination of his employment.  Defendant further indicates that even if Plaintiff can demonstrate a prima facie case, it has come forward with a legitimate non-discriminatory reason for terminating his employment, and he has not shown that such reason is false and pretextual.  Plaintiff responds that he engaged in protected activity, by participating in his wife's discrimination action and by assisting in the investigation of harassment claims by co-workers, and that even if he did not engage in protected activity, he is still protected from retaliation by virtue of his wife's protected activity, pursuant to *Thompson v. North*

---

[12]The EEOC complaint also purported to allege discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and ADA. Plaintiff is deaf in one ear.  In the EEOC complaint, and in this action, Plaintiff alleges that his manager told him that he was old and out of shape, and that jokes have been made about his hearing impairment.  However, Plaintiff's Complaint *in this action* does not purport to state claims under the ADEA or ADA.  Nor has Plaintiff shown any connection between such alleged comments and the termination of his employment.

[13]But not under the ADA or ADEA.

*American Stainless, LP*, — U.S. — ,131 S.Ct. 863 (2011).  Plaintiff also indicates that he

has made a prima facie showing of causality, based on temporal proximity.  Additionally,

Plaintiff maintains that he has raised a triable issue of fact as to pretext, for several

reasons, including that: 1) Defendant relied on evidence that was not credible, such as

Parnusie's statement; 2) Defendant acted as if Mr. Jensen was justified in threatening

him; 3) Defendant did not inform him of Jensen's specific accusations against him, and

therefore he did not have a fair opportunity to respond; and 4) Jensen initiated

conversations about her personal life, and never indicated that she found Plaintiff's

comments offensive. *See*, Pl. Memo of Law [#21]. On May 19, 2011, counsel for the

parties appeared before the undersigned for oral argument.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary

judgment bears the burden of establishing that no genuine issue of material fact exists.

*See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make

a prima facie showing that the standard for obtaining summary judgment has been

satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In

moving for summary judgment against a party who will bear the ultimate burden of proof

at trial, the movant may satisfy this burden by pointing to an absence of evidence to

13

support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.

The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Title VII and the NYHRL*

Plaintiff brings this action under Title VII, which "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).

14

Generally, "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n. 1 (2d Cir.1997), cert den. 522 U.S. 997 (1997). Consequently, unless otherwise noted, references to Title VII below are also intended to refer to the NYHRL.

*Retaliation*

The legal principles for retaliation claims are clear:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  First, the plaintiff must establish a prima facie case of retaliation by showing: " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is " de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. (internal quotation marks omitted).
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id*. The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id*. A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

It is well settled that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560,

566 (2d cir. 2000).  In deciding whether a particular activity amounts to "protected

activity," "the employment practices opposed by the plaintiff need not have actually

amounted to a violation of Title VII.  Rather, the plaintiff must have had a good faith,

reasonable belief that the underlying challenged actions of the employer violated the

law." *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001).  Significantly,

for purposes of this case, "implicit in the requirement that the employer have been aware

of the protected activity is the requirement that it understood, or could reasonably have

understood, that the plaintiff's [complaint] was directed at conduct prohibited by Title VII."

*Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir.

1998).

      To make a prima facie showing of an adverse action, "a plaintiff must show that a

reasonable employee would have found the challenged action materially adverse, which

in this context means it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc.*

*Servs.*,  461 F.3d at 207 (*quoting  Burlington N. & Santa Fe Railway Co. v. White*, 548

U.S. 53, 126 S.Ct. 2405, 2415 (2006)).

      *The Court assumes, for purposes of this decision, that Plaintiff has demonstrated*
*a prima facie case*

      Defendant maintains that Plaintiff cannot establish a prima facie case, because he

has not shown protected activity or a causal nexus between such activity and the

termination of his employment.  However, even assuming *arguendo* that Plaintiff can

establish a prima facie case, the Court finds, for reasons discussed below, that

Defendant is nevertheless entitled to summary judgment.  Consequently, the Court will

16

not discuss the arguments pertaining to prima facie case.

*Plaintiff has not demonstrated a triable issue of fact as to pretext*

As already discussed above, Defendant maintains that it terminated Plaintiff's employment based on Rachow's determination that Plaintiff made inappropriate statements about Jensen and her husband.  Plaintiff denies that he made many of the most egregious comments, but he cannot disprove that Jensen actually accused him of making them.[14]  Nor does Plaintiff contest that Jensen, Parnusie, and Linborg gave statements to Rachow which corroborated Jensen's complaint, although he maintains that such statements are false.  Moreover, Plaintiff cannot dispute that when Rachow asked him to explain why Mr. Jensen might have been angry at him, he failed to mention that he had recently asked Jensen whether she was afraid that her husband might molest her daughter, in light of the fact that her husband was a sex offender.[15]  And finally, Plaintiff does not dispute that the alleged statements, if in fact made by him, were inappropriate and warranted punishment.  Nevertheless, Plaintiff contends that Defendant's purported reason for terminating him was false, and that the real motive was retaliation.  In support of his position, Plaintiff points to several factors, which are as follows: 1) Defendant did not have credible evidence of Plaintiff's guilt; 2) Defendant did

---

[14]Again, at deposition, Plaintiff indicated that Jensen might have made the allegations about him to her husband, in order to start a conversation with her husband about her concerns for her daughter's safety.

[15]*See*, Pl. Dep. at pp. 124-125, 176-180.

not seem concerned about Plaintiff's safety after Mr. Jensen's threatening phone call;[16] 3) Rachow did not advise Plaintiff of Jensen's accusations at the time she interviewed him; and 4) Jensen initiated conversations about her personal life, and never indicated that she found Plaintiff's comments offensive.  However, none of these alleged factors creates a triable issue of fact as to whether Defendant's explanation is false and pretextual.

At the outset, even assuming that Jensen initiated conversations about her personal life, that would not immunize Plaintiff, her superior, from being disciplined for making offensive comments about Jensen and her husband.  Furthermore, the fact that Defendant did not take any action against Jensen or her husband, as punishment for Mr. Jensen's phone call, does not raise an inference of retaliation.  In that regard, Defendant did not employ Mr. Jensen, and Plaintiff has not suggested that Defendant should have disciplined Jensen for her husband's actions.  Moreover, while Plaintiff contends that Defendant should have been concerned about his safety, Plaintiff himself declined to pursue criminal charges against Mr. Jensen or to take any other defensive action.[17] Thus, it is unclear what Plaintiff wanted Defendant to do about Mr. Jensen's phone call, or how Defendant's failure to do it affects the veracity of Defendant's explanation for why it terminated Plaintiff's employment.

---

[16]Plaintiff indicates that he was the victim of a threat, and that Defendant should have done something about it: "Defendant further concedes that, although it knew about this threatening/harassing phone call, it did not take Plaintiff's complaint seriously, but, in fact, believed it was warranted, acceptable conduct, notwithstanding Defendant's policies prohibiting threats of violence towards employees in the workplace, even by third-parties."

[17]In fact, according to Linborg, Plaintiff stated that if Mr. Jensen approached him in person, he would "break that little shit in half." Rachow Aff., Ex. B.

Additionally, Plaintiff has not explained why it was unreasonable for Rachow to believe the statements by Jensen, Parnusie, and Linborg.  On this point, Jensen and Parnusie gave statements that were consistent, and Linborg, the second-in-command at the store, indicated that Plaintiff admitted making many of the same comments described by Jensen and Parnusie.  Further, Linborg told Rachow that Plaintiff told him that Mr. Jensen had called him in response to a particular conversation that Plaintiff had with Jensen.  Therefore, when Plaintiff told Rachow that he did not know why Mr. Jensen had called him, it was reasonable for Rachow to conclude that Plaintiff was not being truthful.  Finally, Plaintiff maintains that Rachow should have told him about Jensen's accusations, and given him a chance to respond to them.  However, as just discussed, it was reasonable for Rachow to believe, based on what Linborg told her, that Plaintiff was well aware that his statements to Jensen were the catalyst for Mr. Jensen's angry phone call.  Consequently, in Rachow's view, she gave Plaintiff multiple opportunities to explain his comments when she repeatedly asked him why Mr. Jensen would have called him.  Although it might have been preferable if Rachow had directly confronted Plaintiff with the alleged statements, the fact that she didn't does not  raise a triable issue of fact as to Defendant's proffered reason for terminating Plaintiff's employment.

Plaintiff insists, in conclusory fashion, that the accusations against him were fabricated in order to retaliate against him.  However, it is not enough for Plaintiff to maintain that he was innocent of the accusations against him, as long as Rachow believed in good faith that he was guilty. *See, Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (Although plaintiff disputed the truth of allegations against her leading to the termination of her employment, such dispute could

19

not defeat summary judgment, since plaintiff had no proof that her supervisor fabricated the complaints, nor any proof that her supervisor disbelieved the reports).  Plaintiff has not come forward with evidentiary proof in admissible form to reasonably suggest that Rachow, or anyone else, was actually motivated by a desire to retaliate against him for his or his wife's alleged protected activity.

Nor, has Plaintiff shown a triable issue of fact based solely on temporal proximity between the termination of his employment and the alleged protected activity by his wife and him.  In that regard, even assuming *arguendo* that Mrs. Males' complaints about *disability* discrimination could form the basis for a *Title VII* retaliation lawsuit, which the Court doubts,[18] such complaints were not sufficiently close in time to the termination of Plaintiff's employment.  Specifically, Mrs. Male began complaining about discrimination in June 2006, almost two and one-half years before Defendant terminated Plaintiff's employment.  During the following two years, Mrs. Male filed two EEOC complaints and two lawsuits in this Court.  Plaintiff does not allege that he suffered any retaliation during that period.  It was not until five months after Mrs. Male filed her second lawsuit that Defendant terminated Plaintiff's employment.  On these facts, there is not sufficient temporal proximity to defeat summary judgment.  Similarly, even assuming *arguendo* that Plaintiff's involvement, as part of his routine job duties, in reporting or investigating incidents of harassment between employees under his supervision qualified as protected

---

[18] *See, Rich v. Associated Brands, Inc.*, 379 Fed. Appx. 78, 80, n.1 (2d Cir. May 28, 2010) ("Title VII  . . . protects against discrimination based on an 'individual's race, color, religion, sex, or national origin,' but not disability.") (citation omitted); *see also, Santucci v. Veneman*, No. 01 CIV. 6644(CBM), 2002 WL 31255115 at *3 (S.D.N.Y. Oct. 8, 2002) ("[T]he protected activity  alleged [in a Title VII retaliation case] must involve some sort of complaint about a type of discrimination that Title VII forbids.") (citation omitted).

activity, which again the Court doubts,[19] three of the incidents occurred many months,

and in some cases, years, before the termination of Plaintiff's employment.  In fact, some

of those incidents occurred before Plaintiff was assigned to Store 410.  The fourth and

last incident, in which Plaintiff told O'Connell that Jensen was being harassed by a male

co-worker, occurred in September 2008, shortly before Defendant terminated Plaintiff's

employment.   However, Plaintiff has not explained how such event is possibly related to

the termination of his employment, or why Defendant would seek to retaliate against him

on that occasion when it did not do so following the earlier three incidents.  The Court

cannot see how such routine reporting would put Plaintiff in opposition to the alleged

harassment, or how Defendant would bear any retaliatory animus toward Plaintiff

because of that incident.  On these facts, temporal proximity is not sufficient to raise a

triable issue of fact.

---

[19]*See, Ezuma v. City Univ. of New York*, 665 F.Supp.2d 116, 122-124 (E.D.N.Y. 2009) ("[I]f an academic chairperson is required as part of his job to report incidents of sexual harassment that come to his attention, as is the case here, the mere performance of that function is not "opposition" to his employer and does not constitute protected activity."); *id.* at 129 ("[P]laintiff must oppose discrimination, rather than simply report it as part of his job, to have a retaliation claim."), *aff'd*, 367 Fed.Appx. 178 (2d Cir. Feb. 22, 2010) (table); *see also, Adams v. Northstar Location Servs., LLC*, No. 09–CV–1063–JTC, 2010 WL 3911415 at *4 (W.D.N.Y. Oct. 5, 2010) ("[P]laintiff's actions in investigating the complaint of race-based harassment would not constitute protected activity, as plaintiff was acting in the scope of her employment as a human resources director by interviewing the witnesses to the incident."). Here, there is no indication that Plaintiff's involvement in the four instances of harassment was anything more than a minor, routine duty for him, nor is there any indication that such involvement would have put him at odds with his superiors or with Defendant.

CONCLUSION

Defendant's  application for summary judgment [#10] is granted and this action is

dismissed with prejudice.   The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated: Rochester, New York
       June 21, 2011
                                          ENTER:


                                           /s/ Charles J. Siragusa
                                          CHARLES J. SIRAGUSA
                                          United States District Judge